Violet Elizabeth Grayson
Attorney at Law
270 Ninth Avenue
San Francisco, CA 94118
(646) 406-1512
vegrayson@gmail.com

Attorney for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

-----------------------------------------------------------x
Jim Roe,                                                    :
                                                            :        **AMENDED COMPLAINT**
                                                            :
            Plaintiff,                                      :
                                                            :
                    vs.                                     :        Case No. CV-17-3249 (BLF)
                                                            :
Mountain View Police Department,                            :
Officer Patrick Ward, Officer Britton Moore,                :
Officer Marco Garcia, City of Mountain View,                :
and Does 1-10,                                              :        **JURY TRIAL DEMANDED**
                    Defendants.                             :
-----------------------------------------------------------x

## INTRODUCTION

1.      Plaintiff  brings suit against three Mountain View, California, police officers, the

Mountain View, California, Police Department, and the City of Mountain View, California,

under 42 U.S.C. section 1983. He further asserts related state law causes of action. On June 7,

2015, a Sunday night, two Mountain View police officers maliciously arrested Plaintiff in his

home for alleged misdemeanor conduct occurring over two weeks earlier. This arrest was made

without benefit of probable cause or an arrest warrant, absent any exigent circumstance, and in

violation of California Penal Code section 836 as well as the Federal and California

Constitutions. The police arrested Plaintiff in his home with reckless disregard for the emotional

well-being of Plaintiff's autistic son, who was in the home, pounding on the walls and screaming

in response to the commotion, while his mother wept. In the wake of the unlawful arrest,

Plaintiff was subjected to unconstitutional interrogation after he requested counsel, strip-searched, cavity-searched, and incarcerated in the County Jail. The foregoing conduct violated Plaintiff's civil rights, his statutory rights, and his common-law rights, as well as subjecting both him and his family to severe emotional distress.

## JURISDICTION AND VENUE

2.     Jurisdiction over this section 1983 action is conferred upon this Court by 28 U.S.C. section 1331 and 28 U.S.C. section 1343 subd. (3). Plaintiff further invokes this Court's supplemental jurisdiction over his pendent state law claims.

3.     Venue is properly laid in the Northern District of California, because the events giving rise to this action occurred within this District, in Los Altos California and in Mountain View California. Intradistrict Assignment to the San Jose Division is proper because the events giving rise to this case occurred in Santa Clara County.

## PARTIES

4.     Plaintiff, Jim Roe, is the pseudonym of a natural person residing in Los Altos, California. He sues under this pseudonym to protect his own privacy and the privacy of his family.

5.     Defendant Patrick Ward ("Officer Ward") is, or was, a Mountain View, California, Police Officer.

6.     Defendant Britton Moore ("Officer Moore") is a Mountain View, California, Police Officer.

7.     Defendant Marco Garcia ("Officer Garcia") is a Mountain View, California, Police Officer.

8.     Defendant City of Mountain View ("CMV") is, upon information and belief, a municipal corporation organized under the laws of the State of California

9.      Defendant Mountain View Police Department ("MVPD") is, upon information and belief, a department, office, or subdivision of Defendant CMV.

10.     Does 1-10 are persons, acting in concert with the named defendants, whose identity Plaintiff has not been able to ascertain at this time.

## PLAINTIFF'S PERSONAL BACKGROUND

11.     Plaintiff, Jim Roe, was born on June 16, 1961, in Rochester, New York.  He holds a Bachelor's degree and a Master's Degree, both in Chemical Engineering, and both from Cornell University. Prior to the events of late spring 2015, described below, Roe was never arrested, never charged with a crime, and never convicted of a crime. Indeed, Roe had no contact with law enforcement whatsoever.

12.     Jim Roe has been married to Lisa Roe since 1988. They have resided at their current address in Los Altos, California for 29 years. They own their home outright. Lisa, like Jim, has a bachelor's degree and a master's degree. Both are from Stanford University in the field of Industrial Engineering. Throughout their marriage, Jim and Lisa have both held responsible, well-compensated jobs at Silicon Valley high-tech companies. Jim has specialized in the development and manufacture of novel, lifesaving bio-medical devices.

13.     On July 12, 1994, a daughter was born to Jim and Lisa Roe. She recently graduated from Stanford University with a Bachelor of Science degree, and works and lives in San Francisco.

14.     On October 10, 1999, a son, JR, was born to Jim and Lisa. In the first several months of life, JR exhibited substantial developmental delays. He was a "floppy baby" suffering from hypotonic cerebral palsy, and could not crawl or walk before age three. Eventually, it became apparent that JR was also severely autistic, unable to speak and exhibiting significant behavioral issues. He was not, however, emotionally disturbed or significantly intellectually impaired. JR

has benefitted from extensive speech therapy, learning to speak in short sentences. Nonetheless, he is often unintelligible to those who do not know him. JR often makes loud noises in addition to speaking. He is unpredictable, impulsive, and prone to bolt from parental control. JR is often accompanied by his service dog, Oakland, who helps Jim and Lisa manage JR in public places.

15.    Jim and Lisa Roe have given their all to provide their autistic son JR with the best possible education and therapy. In addition to enrolling JR in a renowned school for autism, Jim and Lisa offer JR every enrichment and activity that can facilitate his development and help him toward a happier life within the community. These activities have included private speech and occupational therapy, special needs baseball, basketball and soccer, farm animal visits, and Youth Drama for All.

16.    The Mountain View El Camino YMCA (the "YMCA") was long a special place for the Roe family. The Roes were charter members. At the YMCA, the Roes found a place of respite and safety, where they could exercise and relax within an inclusive community.  Over the years, the Roes contributed many volunteer hours to ensuring that the YMCA was accessible to all.

17.    The Roes were instrumental in introducing the inclusive "Y Dance for All" group, and participated in this group each Saturday. After Dance for All each Saturday, the Roes would eat a lunch or snack at the YMCA. Then, JR would take a private swimming lesson while his parents swam laps.

18.    Jim, in addition to directly helping his son, JR, by providing the education and activities described above, also contributes to the community in ways related to JR's disability. Jim has volunteered as a puppy-raiser for Guide Dogs for the Blind, and was certified to lead their autism dog team. Jim also served on a committee to find and purchase a new facility for his son's school, now chairs a committee to find and manage outdoor spaces for the school, volunteers for

Animal Assisted Happiness (a Los Altos non-profit) to build-out a new "Smile Farm" in Sunnyvale, and is working with Lisa to develop a Constellation Community Living model for special needs adults. Jim will soon begin serving on a Santa Clara County oversight committee for the non-profit Magical Bridge Foundation's efforts to build parks for people with special needs.

19.     Lisa is also deeply involved with community activities related to her son's disability. She takes the leading role in developing the Constellation Community Living model for special needs adults. She serves on the Board of Directors of the Los Altos-based non-profit, Animal Assisted Happiness. She leads efforts to develop inclusive "Y for All" programs at the YMCA. Finally, Lisa plays a leading role in the Mountain View Act for Good program that inspires an inclusive and safer community for all.

<strong>EVENTS OF MAY 23, 2015</strong>

20.     On May 23, 2015, Jim, Lisa, and the service dog, Oakland, accompanied JR to the YMCA, for the family's usual Saturday routine. The family participated in the 1 p.m. Y Dance for All Group. Then they sat down on a couch in the YMCA's busy lobby, to consume the snacks that they had packed. Afterward, Jim and Lisa stowed JR's shoes under the couch, and entered the pool area with JR and Oakland. JR took his swimming lesson while his parents swam laps, and Oakland rested in the shade on the pool deck.

21.     After the swim session, Lisa took JR into the Family and Special Needs Shower Area, to assist him in changing back into street clothes. Meanwhile, Jim and Oakland showered separately. Jim finished showering before Lisa and JR, and sat down to wait on the couch in the YMCA lobby, under which JR's shoes were stowed. JR's service dog, Oakland, sat calmly at Jim's feet. Jim began reading through his e-mails on his cell phone.

22.     Two young girls were sprawled at the opposite end of the sofa, a short distance from where Jim sat down. The girls sat up and chatted with Jim about Oakland, who was wearing a service dog jacket. Jim explained that Oakland was a certified Autism Service Dog, for his son JR, who would soon be meeting Jim in the lobby. One of the two girls petted Oakland.

23.     A few minutes later, JR emerged from the Family and Special Needs Shower Area, located down the main hallway from the lobby. JR stood five feet eleven inches tall and weighed 165 pounds at this time. He was making loud noises that could be heard the entire distance away in the lobby. JR ran barefoot down the hallway, and entered the lobby flapping his arms with his head held low. JR plopped himself down forcefully onto the couch in between Jim and the girl who remained seated on the couch. Almost immediately, JR leaped up again and attempted to dart away. As darting was an on-going problematic behavior, Jim grabbed JR by the back of his t-shirt, pulled him back onto the couch, and said something to the effect of "sit your butt down." This was Jim's routine response to JR's attempts to dart away.

24.     Shortly thereafter, Lisa entered the lobby, carrying a swim bag. Lisa asked Jim about a foul smell in the lobby, and Jim responded non-verbally by pointing to a homeless man seated nearby, across from the couch, surrounded by his soiled belongings. Lisa began organizing the family's belongings to leave the YMCA.

25.     One girl was still sitting on the couch as the Roe family prepared to leave. A woman, who appeared to Jim to be the girl's mother, approached. Jim asked the woman if the girls were twins, stating that he himself was a twin. The woman did not respond before leaving the YMCA with the girl. Then, Jim helped JR don his shoes and socks, attached JR to Oakland's harness, and departed the YMCA with his wife, son, and dog.

**EVENTS OF JUNE 5, 2015**

26.     On June 5, 2015, Maria S. drove her daughter Savannah to the MVPD. Maria was interviewed by Officer Patrick Ward. Maria told Officer Ward that a friend of hers told her that, according to the friend's daughters, a man, with a service dog and an autistic child, had bothered Maria's daughter, Savannah, at the YMCA. Maria had not seen anyone bothering Savannah.

27.     During her interview with Officer Ward, Maria characterized herself as "the kind of mom that like, I always see where my kids are." Maria was concerned about "pervs": "I'm assuming that pervs like to befriend kids or act like they're cool or like get comfortable, but they're actually violating your space. . ." She further explained: "I sent my daughter to Walden West . . . A counselor got caught with hundreds of images of child porn and now the second kid came out and said he was molested, and my daughter went there, she just went there. Now I asked my daughter, oh my gosh do you recognize this guy?  . . . The thing is these types of things happen and someone has to be paying attention. . . What I told my daughter is you have to say something because it's not just for you but you could be protecting someone else."

28.     Maria expressed to Officer Ward that she was not pleased with the YMCA, either when she initially visited to sign up for a trial membership, or later when she telephoned to complain about her daughter being bothered by the man with the service dog. According to Maria, during the initial visit, the YMCA took a "fricken" "long time" to process her trial membership application. As she departed, an "Asian guy he looked at me kind of funny and I felt like he's looking at us weird because he thinks our kids are brats cuz it was like 3:30 and the girls were off the hook." When she left the YMCA, Maria thought that her daughter was "acting weird," but "she kept saying nothing's wrong." Approximately twelve days later, Maria heard from her

friend that the friend's daughters said that a man with a service dog and autistic child, about six years old, touched Savannah at the YMCA.

29.     When Maria called the YMCA to complain, she was not satisfied with the YMCA's response. She felt that the YMCA should have called a high-level meeting to discuss the issue. Maria also believed that the YMCA should have been able to immediately identify members with service animals. Displaying her ignorance of controlling federal law, Maria informed Officer Ward: "They should know those things because when you have a service animal and you bring him into a facility you should get some information about the animal like do they have their rabies shots, certain vaccinations -- you have to. You can't just take a service animal into [a YMCA]."

30.     Maria also took umbrage at being asked to put her complaint in writing: "They have a potential child molester on their hands. And then they wanted me and my daughter to write-up something to put in their file … I think it all comes down to money, it comes down to this person is a member, and they want his money, we are not members, it doesn't matter. This gave me the impression that I would never want to go back to the YMCA because all you care about is if I'm a member or not. This is the first time we ever went to this place and this happened. I'm glad I don't pay money because if I paid money and this happened, I'd flip out. *They'd be calling you guys [MVPD] because I'd be pissed-off. . .*"

31.     Maria went on to speculate that Jim could be molesting special needs children, and that the Mountain View YMCA employed "2-way mirrors": "They need to do more than just put it in the file . . . [T]his guy has an autistic son -- he could be having access to all kinds of special needs children and he's just touching them . . . they could have two-way mirrors, they could be

doing all kinds of weird stuff and you know what happens and you might think this woman's been watching too much news."

32.     The Mountain View police interviewed Savannah, as well as her mother, Maria. The interview was video-recorded. Savannah stated of the man with the service dog: "He slapped me on the butt and asked me 'how old are these buns?'"  Interviewing Office Ward asked Savannah to illustrate, on the couch at the MVPD, how she was situated on the couch at the YMCA when this happened. In repeatedly illustrating how she was situated on the YMCA couch, Savannah consistently placed herself *on* her buttocks, with her buttocks pressed against the couch seat cushions, rendering the story physically impossible. Officer Ward, apparently puzzled, asked Savannah: "He was able, based on how you were sitting, he was able to reach past-- all the way past your legs?" Officer Ward's tone was one of incredulity.

33.     Savannah further explained that next, she and her friend asked the man about the service dog, and the man explained that Oakland was a service dog for his autistic son. According to Savannah, when the autistic son walked into the lobby, he appeared to be 11 or 12 years old.

34.     In a follow-up interview, Savannah reiterated that the man with the service dog "smacked her on the butt" but did not "touch any private areas." Officer Ward asked: "do you have any idea why he would've done that?" Savannah replied: "He was probably a pervert." This response, in an interview occurring nearly two weeks after the alleged touching, echoed Savannah's mother's obsession with "pervs" as reflected in her separate interview with Officer Ward. It also suggests that Savannah was influenced by: (a) the news story about child molestation at Walden West, which aired the day before the visit to the police, and (b) Maria's remarks to Savannah concerning molestations at Walden West and "perverts" in general.

35.     The allegation that Plaintiff smacked Savannah on the "butt," and asked "how old are these buns," is entirely false. Plaintiff neither smacked Savannah's "butt" nor said anything regarding her "buns."

**EVENTS OF JUNE 7, 2015**

36.     Based upon the physical impossibility of the buttock-smacking story as told by Savannah, the MVPD and Officer Ward should certainly have known, and did know, that Savannah's story was untrue. The story of Jim sexually molesting Savannah in a crowded lobby, with her mother a few feet away registering for a trial YMCA membership, and Jim's wife and child about to arrive on the scene, was simply absurd. Moreover, Defendants should have understood that this was a false copycat accusation, because Maria and Savannah came to the police nearly two weeks after their visit to the YMCA, but the day after CBS Bay Area News reported that a second child molestation victim had come forward at the Walden West Science Camp. Indeed, Maria concluded her speculative ramblings about "pervs" with a direct reference to hearing on the news about a second victim coming forward at Walden West. Nonetheless, rather than greeting the copycat accusation with skepticism, Officer Ward responded to Maria's assertion that "these types of things happen and someone has to be paying attention," by stating "I agree."

37.     Defendants joined in the witch-hunt atmosphere, in the wake of the Walden West Science Camp revelations, by deciding to arrest Jim. They elected to arrest him inside his home, without probable cause and without any warrant, for alleged misdemeanor conduct occurring over two weeks earlier. This both violated Jim's Fourth Amendment right to be secure from seizure in his home, and violated California Penal Code section 836, which prohibits arrests for misdemeanors committed outside the immediate presence of a police officer.

38.     Defendant Mountain View Police Officers Ward and Moore entered the home of Jim and Lisa Roe at 9:33 p.m., on June 7, 2015, without benefit of either an arrest warrant or a search warrant. They attempted, unsuccessfully, to separate Jim and Lisa, and to interrogate them separately. When Lisa and Jim refused to be separated and refused to be interrogated in the absence of counsel,  Officers Ward and Moore handcuffed Jim, and arrested him without benefit of an arrest warrant.

39.     The warrantless intrusion was extremely distressing to Lisa, who wept continuously while the police remained in the house. JR became highly agitated from the commotion.  He banged on the walls and screamed, then alternated between attempting to comfort his mother, smacking his hands together, and screaming. Lisa, in turn, tried to calm JR.  Upon exclaiming, "Dad's gone," Jeffrey retreated into his room, and continued smacking, banging, and screaming. JR's last words before the police left the house were "Mommy is upset. Mommy is upset. Dad's gone. . . . Mommy is upset  [inaudible] upset."

40.      Officers Ward and Moore parted Jim from his wallet, but allowed him keep his cell phone, giving the false impression that Jim would be permitted to use the cell phone to call Lisa. In fact, Officers Ward and Moore permitted Jim to bring his cell phone to the police station only because they intended to coerce Jim to consent to a warrantless search of the phone. Both officers ignored Lisa's request that they wait for an attorney friend of the family to arrive.

41.     Defendants deliberately arrested Jim on a Sunday, because he could not be released on bail until the following business day. Per their pre-existing plan, Defendants took advantage of this extended custody to: (a) interrogate Jim in isolation notwithstanding his request for an attorney, (b) pretend that they had an incriminating video of the YMCA lobby during the alleged incident, and (c) coerce Jim's consent to a search of his cell phone. Defendant Officer Garcia

took a leading role in the interrogation. Jim denied all wrongdoing, and stated that any video recording of the YMCA lobby would vindicate him. The search of Jim's cell phone produced nothing incriminating. In fact, the police did not possess a video recording of the YMCA lobby.

42.     After the Mountain View police completed their extended, late-night interrogation of Jim, he was transferred, at approximately 1 a.m., to San Jose. Following a strip-search and cavity-search, Jim was confined, overnight and for part of the following day, in the County Jail with drug addicts and career criminals. The strip-search and cavity-search at night in the County Jail were part of Defendants' plan to ensure that Jim would be punished regardless of whether he was ever convicted of anything.

43.     *The bodily and personal violation that Jim suffered at Defendants' hands was more traumatic than anything that Savannah could possibly have experienced had her allegations been true -- which they were not. Jim's distress was vastly compounded by the distress that his wife and son experienced at the time of his arrest.*

## PROSECUTION

44.     Lisa posted bail for Jim on Monday, June 8, 2015. As it turned out, no YMCA video recording of the lobby area on May 23, 2015 was available to put the matter to rest. Defendants' claim to possessing such a recording was fraudulent. On June, 24, 2015, the Santa Clara County District Attorney filed a two count Misdemeanor Complaint charging Jim with Misdemeanor Sexual Battery in violation of Penal Code section 242-243.4(3)(1), and Misdemeanor Soliciting or Engaging in Lewd Conduct in Public in violation of Penal Code section 647(a). Although both charges were misdemeanors, they carried the threat of sex offender registration.

45.     Jim retained counsel and pursued a vigorous defense with the intention of bringing the case to trial. A pedophilia expert witness was retained, and opined that Jim was not a pedophile.

A second witness, expert in the proper interviewing technique for children alleging sex crimes, was retained, and opined that the interviewing techniques used on Savannah were suggestive. A blue ribbon cast of nine character witnesses, who knew Jim from all aspects of his life, was lined up to testify on Jim's behalf. Jim and Lisa spent tens of thousands of dollars on Jim's defense, and sustained additional financial losses because Jim was unable to work as the case approached trial.

46.     Trial preparation continued for sixteen months. In early September of 2016, Deputy District Attorney, Audrey Pak, offered Jim a plea bargain in which he would admit a "non-290" misdemeanor -- in other words, a misdemeanor that would not require sex offender registration. Jim's lawyer responded to Deputy District Attorney Pak in a hand-delivered letter, stating that the appropriate resolution was dismissal, in light of numerous shortcoming of the prosecution case, which defense counsel set forth in detail. On the eve of trial, in late September of 2016, Deputy District Attorney Pak responded that she would not dismiss the case, and that her last and best offer was for Jim to admit a misdemeanor that would not trigger sex offender registration.

47.     Jim was strongly opposed to accepting the plea bargain because he had done nothing wrong. Nonetheless, as Lisa observed, however weak the prosecution's case, sex offender registration would render a misdemeanor conviction, on the original charges, catastrophic to Jim and his family. Due to residency restrictions for pedophile sex offenders, prohibiting them from living within 2,000 feet of a school or park, sex offender registration would require Jim to leave the home where he had lived for three decades. He would foreseeably be forced to move from the Silicon Valley, where he and Lisa maintained skilled employment with a level of compensation that enabled them to meet JR's extensive needs.  A rural area, with housing distant from schools and parks, would be unlikely to provide Jim and Lisa with either suitable

employment or an acceptable school for their autistic son, JR. If Jim and Lisa lived apart, the task of caring for JR in a one-parent setting would have become completely untenable.

48.     Ultimately, the coercive power of the threat of sex offender registration was such that Jim pled No Contest to misdemeanor disorderly conduct, even though he had engaged in no disorderly conduct and committed no crime of any description. He was placed on probation for three years, ordered to perform 75 hours of community service, and barred from coming within 300 yards of the YMCA of which he is a charter member.

49.     Jim has retained the undersigned counsel, not only to pursue this action, but also to pursue habeas corpus proceedings challenging the constitutionality of sex offender registration as applied to Jim's case. Upon obtaining a judicial declaration that he cannot be subjected to sex offender registration, Jim will move to withdraw his plea and obtain a complete acquittal at jury trial.

**First Cause of Action - 42 U.S.C. Section 1983 - Jim Roe Against Individual Officers**

50.     Plaintiff incorporates by reference the allegations of the preceding paragraphs of this complaint.

51.     Defendants Ward, Moore, and Garcia (the "Officer Defendants"), acting under color of state law, violated Plaintiff Jim Roe's federal constitutional rights. In particular, they violated his Fourth Amendment rights by arresting him in his home, without probable cause, without an arrest warrant, and absent exigent circumstances, for an act which, had it occurred, would have constituted a misdemeanor. They further violated Plaintiff's Fourth Amendment rights, and his privacy and free association rights secured by the First, Eleventh, and Fourteenth Amendments of the United States Constitution, by coercing him to consent to a warrantless search of his cell phone. The Officer Defendants violated Plaintiff's Fifth Amendment right to remain silent, his

Sixth Amendment right to counsel, and his Fourteenth Amendment Right to Due Process, by continuing to interrogate Plaintiff after he requested an attorney, and by attempting to trick Plaintiff by claiming to possess a videotape of events in the YMCA lobby. The Officer Defendants violated Plaintiff's Due Process, Eleventh Amendment and Fourteenth Amendment rights to privacy, family integrity and parental relations, by unlawfully invading Plaintiff's home on a Sunday night and exposing his wife and autistic son to the sight of Jim being led away in handcuffs. The Officer Defendants further violated Plaintiff's privacy rights by deliberately arresting him over the weekend so that he would be transferred to the San Jose County Jail, and strip-searched and cavity-searched prior to being placed in a cell. There was absolutely no reason why Jim could not have self-surrendered with an attorney present, if the Mountain View Police were determined to book him. As evidenced by the preceding "Plaintiff's Personal Background" section of this Amended Complaint, Jim was scarcely a flight risk. Moreover, California Penal Code section 836 mandated self-surrender as opposed to arrest.

52.     The foregoing constitutional violations were gravely injurious to Jim's emotional well-being and familial relations, and Jim is entitled to compensation for these injuries.

**Second Cause of Action - 42 U.S.C. Section 1983 - Jim Roe Against MVPD and CMV (*Monnell* Claim)**

53.     Plaintiff repeats the foregoing allegations of this Complaint and incorporates them herein by reference.

54.     Plaintiff is informed and believes that the Officer Defendants, in violating his Constitutional rights as set forth above, acted pursuant to established customs, policies, and practices of the MVPD and CMV. Specifically, Plaintiff is informed and believes that it is the custom, policy, and practice of the CMV and the MVPD to:

(a) attempt to interview suspects in their homes prior to arresting them or even informing them that they are suspects, in order to interview suspects alone without benefit of a *Miranda* advisement;

(b) arrest suspects on weekends so as to hold them overnight, at a time when they are unlikely to be able to contact counsel, and to then take advantage of these circumstances to coerce confessions through trickery, Reed, Inbau Interrogation Methods, and the like;

(c) arrest suspected child molesters on weekends so as to punish them, without Due Process, by incarcerating them with career criminals at the jail in San Jose, after forcing them to submit to strip-searches and cavity-searches;

(d) arrest suspected child molesters in front of their families for the purpose of shaming and humiliating the suspect and inflicting emotional distress upon the family;

(e) arrest suspects in their homes without regard to the impact that this may have on autistic family members or family members with other intellectual or emotional conditions rendering them especially sensitive and vulnerable;

(f) deprive suspected misdemeanants accused of touching children, of the opportunity to self-surrender, even if they are not flight risks, and even if California Penal Code section 836 prohibits their arrest.

55.   The actions of the Officer Defendants, set forth above, undertaken pursuant to the customs, policies, and practices of Defendants MVPD and CMV, were gravely injurious to Plaintiff.

**Third Cause of Action - Jim Roe Against All Defendants -**
**Bane Civil Rights Act - California Civil Code Section 52.1 subd. (b)**

56.   Plaintiff repeats and incorporates by reference, the prior allegations of this Amended Complaint.

Amended Complaint

16

57.     The Defendants, and each of them, have, by their actions set forth above, interfered with Jim Roe's exercise and enjoyment of rights secured by the Constitution and laws of the United States, and the Constitution and laws of the State of California. In addition to violating Jim Roe's federal constitutional rights, as previously set forth, Defendants have violated: (a) Jim Roe's right to privacy, protected by Section 1 of the California Constitution, (b) his right to be secure in his person and home against unreasonable seizures, protected by Section 13 of the California Constitution, and (c) his privilege against self-incrimination, right to counsel, and right to due process prior to deprivation of liberty, all guaranteed by Section 15 of the California Constitution. Moreover, Defendants infringed Plaintiff's liberty rights by arresting him for alleged misdemeanor conduct not occurring in the immediate presence of a police officer, in violation of California Penal Code section 836.

58.     Defendants' actions, in violation of Plaintiff Roe's federal and state constitutional rights, and also his state statutory rights, gravely injured Plaintiff. California Civil Code Section 52.1 subd. (b) provides Roe with an individual cause of action and the entitlement to both monetary compensation and prospective injunctive relief for these infringements of his rights. Roe hereby avails himself of all remedies provided by California Civil Code section 52.1 subd. (b).

**Fourth Cause of Action - False Arrest and False Imprisonment - Jim Roe Against All Defendants**

59.     Plaintiff repeats and incorporates by reference, the prior allegations of this Amended Complaint.

60.     Defendants' warrantless arrest of Jim Roe without probable cause, in his home, for alleged misdemeanor conduct, constituted false arrest and false imprisonment, because it violated Roe's federal and state constitutional rights, as well as his rights under California Penal Code section 836.

Amended Complaint

61.     Roe was gravely harmed by this false arrest and imprisonment, set forth above, and as set forth in the Emotional Distress Causes of Action that follow.

62.      Defendants' conduct was not only unlawful but also malicious and outrageous.

63.     Defendants CMV and MVPD are responsible for the conduct of the Officer Defendants under the doctrine of Respondeat Superior.

64.     Plaintiff Jim Roe should therefore be awarded both compensatory and punitive damages against all defendants.

**Fifth Cause of Action - Intentional Infliction of Emotional Distress - Jim Roe Against All Defendants**

65.     Plaintiff repeats and incorporates by reference, the prior allegations of this Amended Complaint.

66.     Defendants intentionally inflicted severe emotional distress upon Jim Roe by their actions, previously set forth, including, but not limited to:

(a) illegally and unconstitutionally arresting him in his home on a Sunday night, in the presence of his wife, who responded with uncontrollable weeping, and of his autistic son who responded with banging on walls, slapping of hands, and screaming;

(b) interrogating Jim Roe at night and alone, notwithstanding his request for counsel;

(c) falsely insinuating that they possessed a video recording of Jim touching Savannah;

(d) subjecting Roe to a strip-search and cavity-search;

(e) incarcerating Roe overnight in the San Jose County jail in the company of drug addicts and career criminals.

67.     Defendants' act of arresting Jim Roe in his home caused Jim to feel that his familial place of refuge had been violated. Witnessing his weeping wife, while helpless to comfort her, was extraordinarily painful for Jim. To this day, Jim worries about, and is pained by, the emotional

injury visited upon JR by the in-home arrest. This is so because JR's autism renders him abnormally sensitive to disruptive stimuli, and simultaneously ill-equipped to discuss and address his distress.

68.     Defendant's unlawful, malicious and outrageous conduct was such as should not be tolerated in a civilized society. Jim Roe is entitled to compensation therefore, as well as punitive damages.

**Sixth Cause of Action - Reckless and Grossly Negligent Infliction of Emotional Distress -
Jim Roe Against All Defendants**

69.     Plaintiff repeats and incorporates by reference the allegations of paragraphs 1-64 above.

70.     Not only was Defendants' conduct an expression of their malice against Jim Roe, as set forth above, it also evinced reckless disregard for the welfare of Jim's autistic son JR. The Officer Defendants, and each of them, was aware that Jim had an autistic son when they decided to arrest Jim in his home on the night of Sunday, June 7, 2015. It was foreseeable, and indeed highly probable, that vulnerable autistic minor JR would be at home at 9:30 p.m. on a Sunday evening when Defendant Officers Ward and Moore approached the Roe residence. Defendants knew, or should have known, that JR's autism would render him especially sensitive to removal of his father from the home, and especially sensitive to the surrounding commotion. Defendants also knew, or should have known, that JR's autism would render him unable to fully comprehend or discuss the arrest, and that, as a consequence, JR's parents' ability to mitigate the harm caused by the arrest in JR's presence would be limited. Defendants inflicted severe emotional harm upon JR by arresting his father in the house when JR was at home. Jim experienced severe emotional distress witnessing his son's reaction and its aftermath.

71. Defendant's reckless disregard for the welfare of autistic JR and his family is outrageous conduct that should not be tolerated in a civilized society. Both compensatory and punitive damages should be awarded.

WHEREFORE, Plaintiffs prays for relief against Defendants as follows:

Awarding compensatory damages according to proof at trial;

Awarding punitive damages according to proof at trial;

Awarding injunctive relief fashioned to prevent any repetition of Defendants' tortious and unconstitutional conduct.

Awarding costs and attorney's fees, if and as provided by law;

Granting such other and further relief as the Court may deem just and proper.

***Jury Trial Demanded.***

Respectfully submitted,


S/s_____
V. Elizabeth Grayson
Attorney for Plaintiffs

Amended Complaint