UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAMES R. ZUEGEL,<br><br>    Plaintiff,<br><br>v.<br><br>MOUNTAIN VIEW POLICE DEPARTMENT (MVPD), et al.,<br><br>    Defendants. | Case No. 17-cv-03249-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF 84] |

On the evening of June 7, 2015, Plaintiff James Zuegel ("Zuegel") was arrested at his home, without a warrant, by officers of the Mountain View Police Department. Zuegel filed this lawsuit alleging violations of 42 U.S.C. § 1983 regarding the manner in which his arrest was carried out against Defendants Mountain View Police Department ("MVPD"), the City of Mountain View ("the city"), and officers Patrick Ward, Britton Moore, and Marco Garcia. *See* Third Amended Compl. ("TAC"), ECF 87. Before the Court is Defendants' motion for summary judgment. ECF 84. Having considered the parties' briefing, oral arguments before the Court on August 13, 2020, and the applicable law, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

## I. BACKGROUND

### A. Zuegel's Arrest and Plea Bargain

On June 7, 2015, a Sunday night, Defendants Moore and Ward went to Zuegel's house seeking to speak to Zuegel. TAC ¶ 42.[1] Two days prior, Zuegel had been accused by a ten-year-

---

[1] Zuegel verified the facts set forth in the TAC. Decl. of James Zuegel ("James Zuegel Decl.") ¶ 2, ECF 88.

old girl of inappropriately slapping her buttocks at the Mountain View YMCA, located at 2400 Grant Road. TAC ¶ 38; Decl. of Patrick Ward ("Ward Decl.") ¶¶2-4, ECF 84-2. The incident allegedly occurred on May 23, 2015. TAC ¶¶ 25-30.  Defendant Ward interviewed the alleged victim and her mother at the police station on June 5, the day the alleged assault was reported. TAC ¶¶ 31, 37. Defendant Ward states that he also interviewed an eleven-year-old friend of the alleged victim who was present for the alleged assault; the mother of the eleven-year-old friend; and the alleged victim's eight-year-old sister. Ward Decl. ¶ 3. Defendant Moore states that he spoke with the manager of the YMCA that same evening. Decl. of Britton Moore ¶ 3 ("Moore Decl."), ECF 84-6. According to Moore, he gave the YMCA manager a description of the alleged perpetrator of the assault—a white male with an autistic son and service dog—and the manager said that description matched a YMCA customer named James Zuegel. *Id.* Based on the interviews they conducted, Defendants Moore and Ward believed there was probable cause to arrest Zuegel for a felony violation of California Penal Code § 288(a) (lewd and lascivious acts upon a child under the age of 14). Moore Decl. ¶ 4; Ward Decl. ¶ 7. Defendants Moore and Ward state that they went to Zuegel's house to speak with him early in the evening of Saturday, June 6, 2015, around 5:45 p.m. and again on the afternoon of Sunday, June 7, 2015, around 4:18 p.m., but no one answered the door. Moore Decl. ¶ 5; Ward Decl. ¶ 8. Defendants Moore and Ward tried to reach Zuegel a third time that weekend, and this is how the pair came to be standing outside Zuegel's door Sunday, June 7, 2015, at a time between 9:00 and 9:30 p.m. Ward Decl. ¶ 9; Moore Decl. ¶ 6; TAC ¶ 42.

Ward was wearing a Body-Worn Camera ("BodyCam") that captured a video recording of the encounter between the officers and Zuegel. Ward Decl. ¶ 14. Zuegel came to his front door to speak with Moore and Ward, and they asked if they could all go inside the house to talk. Tr. 1:15-16, ECF 103-1.[2] Zuegel responded, "Well, what's it about first?" Tr. 1:17. The officers began talking to Zuegel as they all stood outside the house. TAC ¶ 43. Ward told Zuegel that they were investigating an incident that occurred at the YMCA a couple weeks prior. Tr. 1:18-19. As Ward

---

[2] At the Court's request, parties submitted a joint transcript of the BodyCam footage that they each agreed was accurate for the purposes of this motion.

was asking Zuegel questions about his son's service dog, Zuegel's wife, Lisa Zuegel, appeared at the door and said she wanted to know what was going on. Tr. 2:1-28; Ex. A, Lisa Zuegel Dep. Excerpts ("Lisa Zuegel Dep.") 58:3-8, ECF 92-1. Further, Lisa Zuegel said, "if you'd like to come in the house, that's fine," and told them she was going to put on a robe. Tr. 3:7-8. When asked at her deposition about inviting Defendants Moore and Ward into her house, Lisa Zuegel said, "I'm a hostess. I invite people in. I already told you I love to build community. I invite people in." Ex. B, Lisa Zuegel Dep. Excerpts, ECF 84-5.

After his wife left the doorway to go get her robe, Zuegel said, "be right back," and followed his wife inside the house. Tr. 3:13; Moore Decl. ¶ 7. After a few moments, the door to the house opened. Moore Decl. ¶ 7. None of the parties recalls who opened the door. Moore Decl. ¶ 7; Ward Decl. ¶ 10; Lisa Zuegel Dep. 66:3-20. Defendants Ward and Moore entered the house through the open door. Moore Decl. ¶ 7; Ward Decl. ¶ 10; Lisa Zuegel Dep. 65:23-66:2. Later that night, during a post-arrest interrogation of Zuegel at the police station, Zuegel said to Defendant Ward, "well, as you remember, I didn't even want you guys to come in 'cause my wife wasn't fully dressed," and Ward replied, "well, and you didn't say that. You just said, 'No, no, no, no.'" Tr. of Police Interrogation 2:1-3, ECF 96.

Back at the house, once inside, Defendants Moore and Ward requested that Zuegel and his wife separate so they could each be questioned alone. Tr. 4:8-9. Zuegel responded, "Actually, we'd like to be together." Tr. 4:10. Defendant Moore responded, "Well, we don't usually do interviews with two people." Tr. 4:11. Lisa Zuegel responded, "There is—there is—there is no interview." Tr. 4:12. James Zuegel added, "You can leave if you'd like." Tr. 4:13. Defendant Moore continued to try to explain to Zuegel and his wife why they needed to separate. "Normally what we do is we do interviews one at–one at a time with one person. It doesn't have anything to do with your wife at this point, it only has something to do with you. We would really just like to speak with you for a minute.  I can speak with you alone, if you would like, and it would help us to do our job.  We're not here to try to make your life any miserable or we're not trying to disrupt you on a Sunday, the problem is we came on here Saturday, we came here Friday, but you weren't home all day, so this is the reason why we're here Sunday. We're not trying–trying to make it

3

difficult, but …but for us to do our job ... and for us to do it properly, we have certain protocols and certain procedures that the District Attorney would like for us to do." Tr. 5:7-18. Zuegel refused to separate from his wife and, after a brief back-and-forth with the Defendants Moore and Ward, "You can talk with us when we have our lawyer present." Tr. 6:11. With Zuegel invoking his right to counsel, the questioning stopped. Defendants Moore and Ward placed Zuegel under arrest for a felony violation of California Penal Code § 288(a) (lewd and lascivious acts upon a child under the age of 14). Tr. 6:15-20.

After Zuegel had been escorted out of the house, Lisa Zuegel and Defendant Ward remained in the foyer. Decl. of Lisa Zuegel ("Lisa Zuegel Decl.") ¶¶ 6, 7, ECF 89. Lisa Zuegel let her son J.R., who is autistic and speaks only with difficulty, out of his room. Lisa Zuegel Decl. ¶¶ 6, 7. At the time, J.R. was fifteen years old. TAC ¶ 19. J.R. could be heard banging on the wall or door in his room while his parents spoke with the police. Tr. 1:21; 3:19; 5:5; James Zuegel Decl. ¶ 10. Lisa Zuegel states she brought J.R. out from his room because she wanted to explain to Defendant Ward that her son may have inadvertently caused any incident that was alleged to have happened at the YMCA. Lisa Zuegel Decl. ¶ 7. However, J.R. became upset, screamed, and went back in his bedroom. Lisa Zuegel Decl. ¶ 7.

Zuegel was taken to the Mountain View Police Station, where he was interrogated by Defendants Ward and Garcia. TAC ¶¶ 49, 50. It was during this interrogation, shortly after his arrest, that Zuegel said to Defendant Ward, "well, as you remember, I didn't even want you guys to come in 'cause my wife wasn't fully dressed," and Ward replied, "well, and you didn't say that. You just said, 'No, no, no, no.'" Tr. of Police Interrogation 2:1-3.

After the interrogation, Defendant Ward drove Zuegel to the Santa Clara County Main Jail in San Jose at a time between 1:00 a.m. and 2:00 a.m. on Monday, June 8, 2015. TAC ¶ 54; Ward Decl. ¶ 12. While there, Zuegel underwent a strip search and body cavity search. TAC ¶ 54. Zuegel's wife, Lisa, posted bail for him later that day. TAC ¶ 56.

Zuegel was charged with two misdemeanor counts of sexual battery and soliciting or engaging in lewd conduct in public, violations of California Penal Code § 243.4 and § 647(a). TAC ¶ 57. If convicted, both violations would have required Zuegel to register as a sex offender.

4

TAC ¶ 58. Before trial, Santa Clara County deputy district attorney Audrey Pak offered him a plea deal to admit to a misdemeanor offense that would not require sex offender registration. TAC ¶ 59. Zuegel was unwilling to risk a conviction that would require sex offender registration, so he accepted the deal and pled no contest to misdemeanor disorderly conduct by making noise in a public place. TAC ¶¶ 60, 61. As part of the deal, Zuegel was placed on probation for three years, ordered to perform 75 hours of community service, and barred from coming within 300 yards of the YMCA. TAC ¶ 61.

### B. Procedural History

Zuegel filed his initial complaint in this case pro se on June 6, 2017. *See* Compl., ECF 1. He retained counsel and filed an amended complaint on September 13, 2017. *See* Am. Compl., ECF 10. Zuegel asserted six causes of action against: (1) Defendants Moore, Ward, and Garcia ("Officer Defendants") for violations of 42 U.S.C. § 1983; (2) MVPD and the City for violations of § 1983 (Monell Claim); (3) all Defendants for violations of the Bane Act, California Civ. Code section 52.1(b); (4) all Defendants for false arrest and false imprisonment; (5) all Defendants for intentional infliction of emotional distress; and (6) all Defendants for reckless and grossly negligent infliction of emotional distress. *Id.* In an order granting in part Defendants' motion to dismiss, the Court held that many of the claims were barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), which holds that "Section 1983 [claims] are not cognizable when 'establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction.'" Order at 6, ECF 40. The Court first held that *Heck* barred Plaintiff's claim for unlawful arrest without probable cause. *See id.* at 11. The Court then held that Plaintiff's § 1983 claims are barred by *Heck* to the extent they argue any of the following violations: "[arrest despite] lack of a warrant, the coercion to consent to a search of [Plaintiff's phone], the right to remain silent, the right to counsel, and the due process right not to be interrogated." *Id.* at 12 (footnote omitted). "[B]ecause Plaintiff could have challenged all of that conduct in motions to suppress during the criminal proceedings or can pursue it in habeas proceedings," *Heck* bars such claims. *Id.* Since amendment would have been futile, the Court dismissed these claims without leave to amend. See *id.* at 11–12.

Zuegel filed a second amended complaint on May 31, 2018. *See* Second Am. Compl., ECF 43. This complaint contained six causes of action against: (1) the Officer Defendants for warrantless arrest within the home without consent or exigent circumstances in violation of 42 U.S.C. § 1983; (2) the Officer Defendants for Sunday night arrest and the resulting strip- and cavity-search and overnight incarceration in violation of 42 U.S.C. § 1983; (3) the Officer Defendants for infringement of the constitutional right to counsel in violation of 42 U.S.C. § 1983; (4) the Officer Defendants for infringement of the constitutional right of marital and familial association in violation of 42 U.S.C. § 1983; (5) MVPD and the City for violations of § 1983 (Monell Claim); (6) all Defendants for violations of the California Bane Civil Rights Act, Cal. Civ. Code § 52.1(b), seeking injunctive relief only. *Id.* The Court dismissed the claim for infringement of the constitutional right to counsel, interpreted generously as a due process claim, because Zuegel did not allege egregious conduct on the part of the officers sufficient to shock the conscience. *See* Order at 8-10, ECF 56. After further supplemental briefing, the Court dismissed the Bane Act claim for lack of standing because Zuegel could avoid future injury by refraining from illegal conduct. See Order at 2, ECF 59.

The Court granted Zuegel leave to file a third amended complaint on June 22, 2020. *See* Order, ECF 86. The current operative complaint alleges four causes of action against: (1) the Officer Defendants for warrantless arrest within the home without consent or exigent circumstances in violation of 42 U.S.C. § 1983; (2) the Officer Defendants for Sunday night arrest and the resulting strip- and cavity-search and overnight incarceration in violation of 42 U.S.C. § 1983; (3) the Officer Defendants for infringement of the constitutional right of marital and familial association in violation of 42 U.S.C. § 1983; (4) MVPD and the City for violations of § 1983 (Monell Claim).

Defendants filed a motion for summary judgment on June 15, 2020. *See* Mot., ECF 84. Zuegel timely filed his opposition. *See* Opp'n, ECF 93. Defendants filed their reply brief on July 30, 2020. *See* Reply, ECF 97.

**II.   LEGAL STANDARD**

6

### A. SUMMARY JUDGMENT

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell,* 547 U.S. 518, 559-60 (2006). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Celotex*, 477 U.S. at 325; *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "[T]he 'mere existence of a scintilla of evidence in support of the [nonmovant's] position'" is insufficient to defeat a motion for summary

7

judgment. *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *First Pac. Networks*, 891 F. Supp. at 514 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B. QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-part approach for analyzing qualified immunity. The analysis contains both a constitutional inquiry and an immunity inquiry. *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003). The constitutional inquiry requires the court to determine this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If the Court determines that a constitutional violation could be made out based on the parties' submissions, the second step is to determine whether the right was clearly established. *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.

The Supreme Court recently reiterated the longstanding principle that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff v. Ricard*, 134 S. Ct. 2012, 2023 (2014)). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct at 2023.

8

Importantly, though, "'it is not necessary that the alleged acts have been previously held unconstitutional' in order to determine that a right was clearly established, 'as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law.'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (quoting *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005)) (alterations in original). There can be "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Vazquez v. City of Kern*, 949 F.3d 1153, 1164 (9th Cir. 2020) (quoting *Wesby*, 138 S. Ct. at 590). The relevant inquiry is "whether the officer had fair notice that her conduct was unlawful." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)).

### III. DISCUSSION

#### A. Claim One: Warrantless Entry and Arrest Against Defendants Moore and Ward

As the moving party, Defendants Moore and Ward must demonstrate that a rational trier of fact could not find that they violated Zuegel's constitutional rights by entering his house without a warrant and arresting him. Additionally, it must not have been clear to a reasonable officer that they conduct was unlawful in the situation Moore and Ward confronted.

##### 1. Constitutional Violation

The Fourth Amendment guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. amen. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). "This special protection of the home as the center of the private lives of our people reflects an ardent belief in the ancient adage that a man's house is his castle to the point that the poorest man may in his cottage bid defiance to all forces of the Crown." *Bonivert v. City of Clarkston*, 883 F.3d 865, 873 (9th Cir. 2018) (internal quotations omitted) (citing *Georgia v. Randolph*, 547 U.S. 103, 115 (2006)). Here, the parties do not dispute that Defendants Moore and Ward entered the Zuegel

9

home and arrested Zuegel without a search or arrest warrant. Accordingly, the entry was presumptively unreasonable.

Defendants Moore and Ward argue that their entry was nevertheless justified by an exception to the warrant requirement: consent. This exception would permit warrantless entry where officers have obtained consent to enter from a third party—say, a spouse—who has common authority over the premises. But *Georgia v. Randolph* held that a warrantless search of a shared dwelling over the express refusal of consent by a physically present resident cannot be justified by consent given to the police by another resident. 547 U.S. at 106. Defendants do note, correctly, that *Randolph* represents a "narrow exception" to the rule that police officers may search jointly occupied premises if one of the occupants consents. *See Fernandez v. California*, 571 U.S. 292, 294 (2014). The *Randolph* Court explained that, in the context of Fourth Amendment consent cases, "great significance" is given to "widely shared social expectations." *Id.* at 111. The Court further explained that, "[s]ince the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114.

Defendants Moore and Ward argue that Lisa Zuegel gave consent for them to enter the house ("if you'd like to come in the house, that's fine," Tr. 3:7-8) and that Zuegel never expressly refused consent. Mot. 11-13. They further argue that Zuegel's response of, "Well, what's it about first?", Tr. 1:17, to their request to step inside the home was not an express refusal. Mot. 11-13. Zuegel responds to that argument with Defendant Ward's statement during his post-arrest interrogation as evidence that Defendants Moore and Ward understood that he expressly refused to consent to their entry: "well, and you didn't say that. You just said, 'No, no, no, no.'" Tr. of Police Interrogation 2:1-3, ECF 96. Defendant Ward's 2019 deposition testimony walking back his statements made during the post arrest interrogation that "he was simply being chatty" Reply 7, may be persuasive to a jury, but it is not sufficient to obtain summary judgment.

The Court finds a genuine dispute of material fact as to whether the consent exception to a

10

warrantless arrest applies here. The Court cannot resolve this dispute in favor of Defendants Moore and Ward at summary judgment.

### 2. Clearly Established

"Among constitutional rules, few are as well established, frequently applied, and familiar to police officers as the warrant requirement and its exceptions." *Bonivert*, 883 F.3d at 873. This is not a case involving "an undeveloped state of the law" that would require officers to "predict the future course of constitutional law." *Id*. (quoting *Wilson v. Layne*, 526 U.S. 603, 617–18 (1999)). Rather this is a case that requires the officers have a knowledge of "basic, unquestioned constitutional rights." *Id.* (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).

*Randolph* involved the police responding to a domestic dispute call. 547 U.S. at 106. Once they arrived, Randolph's estranged wife told an officer that her husband was a drug user and that there was evidence to support her accusation in the house. *Id.* The officer asked Mr. Randolph for permission to search the marital residence, and he refused. *Id.* The officer then asked Mrs. Randolph for consent, which she readily gave. *Id.* The Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* 120. And although *Randolph* was decided in the context of an evidentiary search, "there is no talismanic distinction, for Fourth Amendment purposes, between a warrantless 'entry' and a warrantless 'search.'" *Bonivert*, 883 F.3d 874.

Defendants argue that, other than *Randolph*, there are no case or other legal authorities with a factual scenario that would "clearly" and "squarely" suggest the entry here was unlawful. Mot. 13. This Court finds that the Supreme Court's fourteen-year-old precedent in *Randolph* fits clearly and squarely and is sufficient to clearly establish the applicable law. *Randolph* states it clearly: a co-occupant's consent cannot override a present occupant's express refusal to consent to entry into a shared residence. Here, viewing the facts in the light most favorable to Zuegel, he was present at his home and expressly refused to consent to the entry of Defendants Moore and Ward, which overrides any consent his wife may have given. Accordingly, Defendants Moore and Ward are not entitled to qualified immunity for their warrantless entry into the Zuegel home.

11

### 3. Conclusion

Because there is a genuine dispute of material fact as to whether the consent exception to a warrantless entry and arrest applies here, Defendants' motion for summary judgment is DENIED as to the first claim. The Court does not endorse nor foreclose any theories or arguments the parties may present at trial on the issue of consent. At the summary judgment stage, the Court only holds that there is a genuine dispute as to the material fact as to whether the consent exception to a warrantless entry and arrest applies.

### B. Claim Two: Inconvenient Sunday Night Arrest Against Officer Defendants

Zuegel's second claim, the Court must state, is far-fetched. In the complaint, his overnight incarceration with a strip- and body-cavity search to ensure the safety of everyone in the facility is argued as a due process violation. TAC ¶¶ 67-70. In the summary judgment briefing, this claim is argued as an equal protection violation, treating persons arrested on child molestation charges worse than those arrested on other charges. Opp'n 11-15. Regardless of the theory, the claim fails.

### 1. Constitutional Violation: Due Process

Under the Fourteenth Amendment's substantive due process prong, an officer's conduct must "shock the conscious" for a claim to succeed. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The threshold question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Fontana v. Haskin*, 262 F.3d 871, 882 n.7 (9th Cir. 2001) (quoting *Lewis*, 523 U.S. at 848 n.8).

The Court is unaware of any federal court, at any level, finding a constitutional right to be arrested from 9 a.m. – 5 p.m., Monday through Friday. This is essentially what Zuegel asks this Court to find. The complaint states "[t]here was no legitimate reason why Defendants could not have arrested Zuegel on the morning of Monday, June 8, 2015," TAC ¶ 68. It continues, "Indeed, there was absolutely no reason why Zuegel could not have self-surrendered with an attorney present, a practice that the MVPD allows in a wide variety of cases." TAC ¶ 68. Here are the undisputed facts: On Friday, June 5, Defendant Ward received a complaint from a 10-year-old girl that a man at the YMCA had touched her inappropriately. TAC ¶¶ 31, 37. Defendant Ward interviewed the girl and her mother that day. *Id.* He also interviewed three other people that day:

12

an 11-year-old who had been present for the incident, her mother, and the alleged victim's sister. Ward Decl. ¶ 3. Defendant Moore spoke the manager of the YMCA, the sixth person to be interviewed in the investigation that same day. Moore Decl. ¶ 3. After these six interviews, Defendants Moore and Ward determined there was probable cause to arrest Zuegel for a felony violation of California Penal Code § 288(a) (lewd and lascivious acts upon a child under the age of 14). Moore Decl. ¶ 4; Ward Decl. ¶ 7. The next day—one day after the complaint was made—Defendants Moore and Ward went to the Zuegel house in the afternoon, but no one was home. Moore Decl. ¶ 5; Ward Decl. ¶ 8. The following day—two days after the complaint was made—Defendants again went to the Zuegel house in the afternoon. Moore Decl. ¶ 5; Ward Decl. ¶ 8. Again, no one was home. Moore Decl. ¶ 5; Ward Decl. ¶ 8. Finally, later that Sunday night, Defendants Moore and Ward went to the Zuegel house a third time. Ward Decl. ¶ 9; Moore Decl. ¶ 6. This time, Zuegel was home. Ward Decl. ¶ 9; Moore Decl. ¶ 6. When Zuegel and his wife refused to speak to Defendants Moore and Ward separately and Zuegel invoked his right to counsel, Zuegel was arrested for a felony violation of California Penal Code § 288(a) (lewd and lascivious acts upon a child under the age of 14). TAC ¶¶ 44, 57; Tr. 6:11. This felony arrest caused Zuegel to have to spend less than 24 hours in custody. TAC ¶¶ 54, 56.

Although any person arrested would prefer a conveniently timed arrest, an evening arrest for a serious crime, such as felony child molestation, is simply not unconstitutional and the Court finds no due process violation resulting from the timing and manner of this arrest.

### 2. Constitutional Violation: Equal Protection

Zuegel articulates, for the first time in opposition to this motion for summary judgment, an equal protection theory: since the MVPD believes complaints of sexual molestation by children are true (unless the parents are divorcing), suspects of child molestation are treated worse than other suspects. Opp'n 11-15. According to Zuegel, this belief leads MVPD to arrest suspected child molesters on a weekend or later in the evening to ensure that the suspect is at least punished with a strip search, body cavity search, and a night in jail regardless of how the District Attorney's Office views the case. Opp'n 13.

"To state an equal protection claim of any stripe, whatever the level of scrutiny it invites, a

plaintiff must show that the defendant treated the plaintiff differently from similarly situated individuals." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1106 (9th Cir. 2012) (quoting *Aleman v. Glickman*, 217 F.3d 1191, 1195 (9th Cir.2000)).

Zuegel cites *Simpson v. Miller*, 387 P.3d 1270 (Ariz. 2017) for the proposition that there is no rational basis for discriminating against persons accused of child molestation, rather than other crimes, and arresting and jailing them without reasonable investigation. In *Simpson*, the plaintiff challenged Arizona's Constitution and laws that forbade bail for defendants accused of sexual conduct with a minor under age fifteen when the proof is evident or the presumption great that the defendant committed the crime. 387 P.3d at 1273. The Arizona Supreme Court held that since the laws were not narrowly focused to protect public safety, they violated the Fourteenth Amendment's due process guarantee. *Id.* Here, though Zuegel was granted bail, rendering *Simpson* completely inapposite.

Zuegel's equal protection claim fails because he has failed to demonstrate that the MVPD treated him and others accused of child molestation differently from those accused of other crimes. As evidence of this intent to discriminate against persons accused of child molestation, Zuegel points to deposition testimony from Defendant Garcia and two other non-defendant officers stating that they believe the vast majority of sexual molestation claims brought by children to be true. Opp'n 12. He also has an expert witness, the owner of Bad Boys Bail Bonds, who states that the arresting officers would have "likely known" that a person booked in a Santa Clara County jail after 9 p.m. inevitably spends the night. Opp'n 14; Decl. of C. Jeffrey Stanley ¶ 5, ECF 90. According to Zuegel, this practice of forcing accused child molesters to undergo body cavity and strip searches and spend the night in jail is a "punishment" for their accused crime. *See* Opp'n 12-13. Zuegel also cites to the complaint in *Lother v. City of Mountain View et al.*, No. 19-cv-05848 VKD (N.D. Cal Sept. 19, 2019) as an example of MVPD's custom, practice, and policy of violating the constitutional rights of those suspected of child molestation. Opp'n 21; Ex K, Compl., ECF 92-11. This case, which the city settled for $600,000, Ex. L, Order, ECF 92-12, involved MVPD officers and a social worker coming to a family's home and forcing a five-year-old to undergo an involuntary vaginal inspection performed by a paramedic. *See* Ex K, Compl.

Neither parent was arrested on suspicion of child molestation. *Id.* The Court does not find these facts analogous to Zuegel's case.

Zuegel has not identified any other person accused of child molestation that was treated similarly to him, with an after 9 p.m. arrest on a Sunday and a jail stay that extended into Monday. Further, there is no evidence that only persons accused of child molestation, and not persons accused of other crimes, are arrested Sunday night so they can't be bailed out of jail until Monday. This distinguishes Zuegel's case from the other case he cites in support of his argument, *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (holding that a Massachusetts statute permitting married persons to obtain contraceptives to prevent pregnancy but prohibiting distribution of contraceptives to single persons for that purpose violates the equal protection clause). Zuegel has not made the threshold showing of the MVPD treating him differently from similarly situated individuals.

In reality, Defendants Moore and Ward had made two previous trips to the Zuegel home before their Sunday night trip. Moore Decl. ¶ 5; Ward Decl. ¶ 8. And there is no evidence that Moore and Ward were aware of the jail's security or bail procedures. Moore Decl. ¶ 9; Ward Decl. ¶ 13. Taking the facts and evidence in the light most favorable to Zuegel, the Court finds no equal protection violation resulting from the manner of his arrest.

### 3. Conclusion

As to claim two, as matter of law, Zuegel cannot establish a violation of a constitutional right. Therefore, the Court will GRANT summary judgment for Defendants on this claim. Further, because this is the only claim that involves Defendant Garcia, the Court DISMISSES him from this case.

### C. Claim Three: Right to Marital and Familial Association Against Officer Defendants

Zuegel's third claim is for a violation of his right to marital and familial association with his wife and son. TAC ¶ 72. The complaint states that Zuegel's arrest was "greatly distressing" to his wife and autistic child, and this violated Zuegel's right to marital and familial association. TAC ¶ 72.

Defendants argue that Zuegel's wife and son are not parties to this action, so he cannot bring these claims on their behalf. Mot. 15. Indeed, Ninth Circuit cases support Defendants' argument that parents and children harmed by the arrest of another family member, and not the arrested family member, may bring this claim. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (analyzing familial association claim brought by parents whose son was killed during police encounter); *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) (same). The cases Zuegel cites support Defendants' argument, too. *See Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (involving mother suing for wrongful arrest of her mentally disabled son); *Fakoya v. Cty. of Clark*, No. 2:12-CV-02149-JAD, 2014 WL 5020592 (D. Nev. Oct. 8, 2014) (featuring minor daughters, through their mother, asserting familial association claim after their father was acquitted of a crime for which he spent two years in pretrial detention). If Zuegel were able to bring this claim, then *every* person arrested in the presence of another family member would have this same claim. Since Zuegel cannot, as a matter of law, prove a constitutional violation of *his* right to marital and familial association, the Court GRANTS summary judgment for Officer Defendants on this claim.

**D. Claim Four: Monell Claim Against MVPD and City**

Finally, Zuegel seeks to hold the city and MVPD liable for their customs, policies, and practices of violating the above-mentioned constitutional rights under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.'" *Id.* (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)) (alterations in original). "Failure to train an employee who had

16

caused a constitutional violation can be the basis for section 1983 liability where the failure to train amounts to deliberate indifference to the rights of the person with whom the employee comes into contact." *Long v. City of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Alternatively, "[a] municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it." *Id.* (internal quotation marks and citation omitted). The policymaker must have actual knowledge of the constitutional violation and affirmatively approve of it – a failure to overrule a subordinate's actions is insufficient to support a § 1983 claim. *Id.*

### 1. Monell Liability Related to Claims Two and Three

As a threshold matter, a plaintiff must have been deprived of an underlying constitutional right to assert a Monell claim against a municipality. As stated above, the Court has already concluded that Zuegel cannot, as a matter of law, prove a constitutional violation of his Fourteenth Amendment rights, which form the basis for claims two and three. Without this underlying violation, there cannot be Monell liability for the city or MVPD. Accordingly, the Court GRANTS Defendants' motion for summary judgment on a Monell claim premised on claim two or claim three.

### 2. Monell Liability Related to Claim One

Since the Court found a genuine dispute of material fact as to whether Zuegel's Fourth Amendment rights were violated, it is proper to consider the legal viability of his Monell claim based on that potential violation.

Zuegel argues both a ratification theory and a failure to train theory. The Court will consider both.

#### a. Ratification theory

Defendants initially pointed to a lack of evidence in the record for any of Zuegel's Monell claims as justification for granting summary judgment. Mot. 16-17. Zuegel cites deposition

testimony from then-acting police chief Christopher Hsiung as evidence that the MVPD ratified the alleged unconstitutional conduct. Opp'n 22-23. When asked if he saw anything inconsistent with MVPD policy during his review of the case file and video recordings, Hsiung said no. Ex. H, Christopher Hsiung Dep. Excerpts ("Hsiung Dep."), 229:11-16, ECF 92-8. He further stated that he did not see any errors in the way the case was handled and would have the MVPD handle the case in the same way again. Hsiung Dep. 228:2-15.

Zuegel's evidence differs from other cases in which courts have allowed ratification theory claims to go forward in a critical way: it was obtained during litigation. In *Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir.1995), the police department conducted an internal investigation concerning reports of sexual harassment by a male officer against a female officer. *Id.* at 1526. The investigation was woefully deficient in many ways—delays in investigation, a failure to meet with or credit the testimony of witnesses supporting Plaintiff, an attempt to close the investigation without even speaking with the accused, and a one-sided resolution of disputes of fact—but the police chief approved the report, thereby ratifying it. *Id.* at 1534-35.

In *Rosales v. City of Chico*, 2:14–02152 WBS CMK, 2015 WL 6167740 (E.D. Cal. Oct. 20, 2015), the chief of police issued a notice of conclusion to an administrative review of an excessive force incident that stated, in part, "The finding regarding the allegation that you used excessive force during the incident has been determined to be EXHONERATED. You were in compliance with Department policy. Consider this matter closed with no further action necessary." *Id.* at *7. The claim was allowed to go forward past summary judgment. *Id.* at *10.

By contrast, in *Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992), the court rejected a ratification theory based on the city manager not revoking the fire chief's decision to terminate Plaintiff and not objecting to the hiring of counsel to represent the city in the arbitration of Plaintiff's grievance. *Id.* at 1347. The Ninth Circuit found that there was no evidence that the city manager made a deliberate choice to endorse the Fire Chief's decision and the basis for it. *Id.* at 1348.

Likewise, Zuegel has not produced any evidence that a policymaker made a deliberate choice to endorse and therefore ratify unconstitutional conduct. Getting dragged into litigation is

18

hardly a deliberate choice. As Zuegel would have it, Hsiung's choice, in response to his counsel's questions, was to either to throw his officers under the bus, admitting their individual liability, or to ensure the liability of his city by stating he saw no policy violations. Zuegel does not cite any case in which liability is imposed as a result of a statement made during litigation, and this Court sees that fact as dispositive on this issue. Therefore, the Court GRANTS summary judgment to the Defendants on the ratification theory.

### b. Failure to Train

A deficient training program "intended to apply over time to multiple employees" can form the basis for municipal liability. *Long*, 442 F.3d at 1186 (quoting *Board of County Commissioners v. Brown*, 520 U.S. 397, 407 (1997)). Demonstrating a pattern of constitutional violations is not necessary where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long*, 442 F.3d at 1186 (quoting *Brown*, 520 U.S. at 409).

Zuegel argues that the deposition testimony of Sergeant Peter Beninger, who had served for years as a training officer and was Defendant Ward's direct supervisor at the time of Zuegel's arrest. Opp'n 20-21; Ex. C, Peter Beninger Dep. Excerpts ("Beninger Dep.") 16:5-8; 18:1-10; 32:2-8, ECF 92-3. Beninger was asked about the consent rule.

> Q: And as you sit here today, do you know what rule applies in a situation where a suspect declines to consent to officers entering a home but a cohabitant invites them in?
> A: Yes.
> Q: What is that role [sic]?
> A: As long as that person has standing in the home, then they could invite the officer in.
> Q: Even if the suspect has denied the officer's entry?
> A: That's correct
> Q: What is the basis for your statement?
> A: Law
> Q: And is that how you train the officers that—are officers trained consistent with the rule you just annunciated?
> A: Yes.

Beninger Dep. 105:6-106:1. Defendant Ward's testimony reflects uncertainty of the legal standard for consent as well. Ex. G, Patrick Ward Dep. Excerpts 140:19-143:18, ECF 92-7. In response, Defendants conclusory state, "Nor is there any evidence that any failure to train amounted to

19

deliberate indifference on the part of the City." Reply 14.

Taking the facts in the light most favorable to Zuegel, the Court concludes that there is a genuine dispute of material fact as to whether Beninger's statements are sufficient to prove Monell liability on the basis of a failure to train theory.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1) Defendants' motion for summary judgment is:

> DENIED as to Claim One, Warrantless Entry and Arrest Against Defendants Moore and Ward;
>
> GRANTED as to Claim Two, Inconvenient Sunday Night Arrest Against Officer Defendants;
>
> GRANTED as to Claim Three, Right to Marital and Familial Association Against Officer Defendants;
>
> GRANTED as to Claim Four, Monell Liability related to Claims Two and Three;
>
> GRANTED as to Claim Four, Monell Liability based on a ratification theory related to Claim One;
>
> DENIED as to Claim Four, Monell Liability based on a failure to train theory related to Claim One; and

2) Defendant Garcia is DISMISSED from the case.

Dated: August 27, 2020

*[signature: Beth Labson Freeman]*

BETH LABSON FREEMAN
United States District Judge